# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

JOSEPH H. WHITNEY,

Plaintiff,

v.

THE GUYS, INC., AGORA SOLUTION
CORP., MYBILLINGSERVICES, INC.,
INFO BILLING, INC.,
MYTELESERVICES, INC.,
LAURENTEL, INC.,
GREENTREEDATA, INC.,
LOWCOSTBILLING, INC.,
YOURBILLINGSOLUTIONS, INC.,
MYSUPERLOTTO, INC.,
MYPRIZEAWARDS CORP.,
MYSERVICEANDSUPPORT, INC.,
XYZ, INC. and JOHN R. MORRISON,

Defendants.

Civil No. 10-4296 (JRT/FLN)

**MEMORANDUM OPINION AND
ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT**

---

Mark J. Kallenbach, **KALLENBACH LAW OFFICE**, 2260 Ridge Drive,
Suite 13, Minneapolis, MN 55416, for plaintiff.

Charlie R. Alden, **THOMPSON HALL SANTI CERNY & DOOLEY**,
901 Marquette Avenue, Suite 1675, Minneapolis, MN 55402, for
defendants.

Plaintiff Joseph Whitney brought this action in October 2010 based upon an

alleged oral agreement he made with Defendant John Morrison pursuant to which

Whitney was entitled to one-half of the shares of stock in at least twelve internet-based

marketing companies. Whitney brought various common law and statutory claims

against Morrison and those twelve internet-based companies ("the Corporate

Defendants"), as well as "XYZ, Inc." a label Whitney uses for defendants that he characterizes as unknown derivative business entities of the Corporate Defendants. Whitney's claims arise out of his allegation that Defendants failed to abide by the oral agreement and recognize Whitney as a shareholder.

Upon remand from the Eighth Circuit, Whitney's remaining claims are those for (1) an accounting, (2) breach of shareholder rights – including right of access to the Corporate Defendants' books and records, participation in the Corporate Defendants' management, and a share in profits, and (3) breach of fiduciary duty – based upon his contention that Morrison – an officer of some or all of the Corporate Defendants – breached a fiduciary duty by misappropriating corporate property. Whitney and Defendants bring cross motions for summary judgment on these claims. Whitney and Defendants also bring cross motions for summary judgment on Defendants' counterclaims against Whitney for conversion, civil theft, unjust enrichment, and fraud, arising out of Whitney's alleged misappropriation of funds from one of the Corporate Defendant entities. Because the Court concludes that the statute of limitations has run on Whitney's claims as well as Defendants' counterclaims, it will grant Defendants' motion with respect to Whitney's claims and Whitney's motion with respect to Defendants' counterclaims to the extent those motions seek dismissal of the opposing parties' claims on statute of limitations grounds. The Court will thus dismiss all claims currently before the Court.

## BACKGROUND

## I.  WHITNEY'S ALLEGATIONS

The paucity of record evidence in this case combined with the failure of the extensive briefs associated with the present motions to connect their presentation of copious isolated facts to a coherent legal theory makes it difficult to construct a logical and/or chronological overview of the events underlying Whitney's claims or otherwise impose order on what appears to have been nothing short of a business relationship disaster.   In light of this difficulty, the Court begins by briefly outlining Whitney's allegations related to his claims as a way of focusing the factual discussion and orienting the reader to the possible relevance of the various record facts identified by the parties.

In his Second Amended Complaint, Whitney alleges that on April 25, 2005, he and Morrison formed The Guys, Inc., one of the Corporate Defendants, and agreed that Whitney and Morrison would each own one half of the outstanding shares in The Guys, Inc., as well as one half of the outstanding shares in wholly owned subsidiaries of The Guys, Inc. – Corporate Defendants MySuperLotto, Inc., Agora Solution Corporation, and MyServiceAndSupport, Inc.  (Second Am. Compl. ¶¶ 9-11, Nov. 5, 2010, Docket No. 5.) Whitney also alleges that in April 2005 he paid $150,000 for one half of the shares in The Guys, Inc., its wholly owned subsidiaries, and all of the other Corporate Defendants, which "were created to carry out business ventures contemplated and agreed to by and between Whitney and Morrison of which Whitney and Morrison were to be equal owners." (*Id.* ¶¶ 13, 14.)  Additionally, Whitney claims that in November 2005 he made a $25,000 capital contribution to Agora Solution Corporation.  (*Id.* ¶ 15.)   Whitney

alleges that Defendants "refuse to acknowledge Whitney's ownership in any of the Corporate Defendants" and "refuse to permit Whitney's participation in the Corporate Defendants' affairs or profits." (*Id.* ¶¶ 16-17.) Whitney contends that as a shareholder of one-half of the outstanding shares in each of the Corporate Defendants he "is entitled to an accounting of each of the Corporate Defendants and Derivative Entities' sales, expenses, assets, and liabilities." (*Id.* ¶ 48.) In support of his breach of shareholder rights claim, Whitney alleges that his rights as a shareholder have been violated because "Morrison has refused and continues to deny Whitney access to any of the Corporate Defendants', including the Derivative Entities', books and records, his right to participate in the Corporate Defendants' and Derivative En[ti]ties['] governance or management and rightful share of their profits." (*Id.* ¶¶ 51-52.) Finally, with respect to his breach of fiduciary duty claim, Whitney argues that Morrison owed Whitney a fiduciary duty "as a shareholder," and breached that duty "by misappropriating corporate property." (*Id.* ¶¶ 59-60.) With this background in mind, the Court sets forth the record facts bearing upon Whitney's claim that he is a shareholder in the Corporate Defendants.

## II.     ALLEGED CONTRACT FORMATION

Whitney is a businessman who, among other things, invests in start-up companies. (Fifth Decl. of Mark J. Kallenbach, Ex. A (Dep. of Joseph A. Whitney ("Whitney Dep.") 29:7-11, 31:6-32:11), Feb. 21, 2014, Docket No. 94.) He met Morrison in the 1980s, and the two began doing business together. (Whitney Dep. 21:1-22:10, 23:13-18.)

Whitney testified that in 2004 or 2005 Morrison approached him with an idea for a business model. (*Id.* 82:13-83:2.) Morrison proposed to set up a corporation to provide

LEC, or Local Exchange Carrier billing, which is a form of billing for internet-based or other electronic services where the user is charged through his account with a local telephone company, rather than directly from the provider of the service.  (*Id.* 83:18-84:3.)  Whitney testified that he and Morrison worked together to develop the business as partners explaining, "[s]o we figured out a budget and we funded that budget - - for each owning 50 percent of the business.  And it was clear and - - without any shred of doubt in our minds, that we were partners."  (*Id.* 84:3-8.)  It is unclear from Whitney's testimony whether he believed the alleged agreement in question was for a fifty percent partnership and a fifty percent share in the profits, or whether the deal was actually to receive fifty percent ownership of stocks in the various companies that grew out of the business model.  Whitney testified:

> Q.   So this was just an agreement that you would be equal partners and you would get half of the profits?
>
> A.   Yes.  Well, I mean - -
>
>      . . . .
>
> A.   He - - he had to gerrymander the companies around a little bit, based on the payment schedule, but, you know, he gave me 100 percent of Agora.  You know, he had 100 percent of another entity.  But, you know, at the end of the day, yes, it was going to be fifty-fifty on all moneys made out of the enterprises.
>
> Q.   So it wasn't exactly a deal that you would get stock in companies, correct?  It was just a deal - - let me put it this way.  Could the deal have taken place without a stock transfer?
>
> A.   Sure.
>
> Q.   So stock was not integral to the deal, is that correct?
>
> A.   No.
>
> Q.   Okay.  So did you feel that because you did not receive certificates for the companies, demonstrating your stock, that you were not getting what you had bargained for?

A. Well, I only got to that when he started playing games on - - on me, not giving me information on the company that I was a partner in, and, you know, then I started asking about the stock.

Of course, he said, "Oh, it's" - - you know - - you know, "You have shares in this. I have shares in that." You know, it all washes out in the end. At the end of the day it's a fifty-fifty deal, period.

Q. So you're - - you were really just partners in this endeavor and you were supposed to get 50 percent of the profits, correct?

A. Pretty much. I mean, I - - whether it came as a result of my ownership by stock or by, you know, profits interests . . . . But it was always the understanding that I had half the deal, whatever that was. One half, 50 percent of the deal.

(*Id.* 86:17-88:15.)

At some point, Morrison created a document titled "The Organization Structure We Focus On Internet Marketing." (Fifth Kallenbach Decl., Ex. H.) Whitney argues that this document laid out the intended structure of his arrangement with Morrison, and supports his claim that he holds fifty percent of the shares in the Corporate Defendants. This document depicts that Whitney's and Morrison's "The JWH & JRM Holding Company" would own one-hundred percent of "The Guys Corp." which would in turn own twenty-five percent of each of six companies – three of which are Corporate Defendants in the present case. (*Id.*) In a handwritten note, the document indicates that the remaining seventy-five percent of the six individual companies would be split "37 1/2% JM" and "37 1/2% JW." (*Id.*) Morrison testified that the JHW & JRM Holding Company and related structure referenced in this document "[n]ever came into existence" and was just a brainstorm on his part. (Fifth Kallenbach Decl., Ex. B (Dep. of John R. Morrison ("Morrison Dep.") 93:17-94:4).)

### III.   STOCK OWNERSHIP IN CORPORATE DEFENDANTS

The Corporate Defendants were all incorporated in Delaware.  (Fifth Kallenbach Decl., Ex. F.)  The first of the Corporate Defendants to be incorporated was Agora Solution Corporation on July 1, 2003.  (*Id.*, Ex. F at 5.)[1]  The Guys, Inc. and MyTeleservices, Inc. were incorporated on April 25, 2005.  (*Id.*, Ex. F at 2, 10-11.)  Whitney and Morrison were named as the initial directors of those two entities.  (*Id.*, Ex. F at 9; *id.*, Ex. O.)  MyPrizeAwards Corp. and MySuperLotto, Inc. were both incorporated in 2005.  (*Id.*, Ex. F at 24, 26.)  The remaining Corporate Defendants were incorporated in 2006.  (*Id.*, Ex. F at 7-8, 13, 15, 20, 22, 28.)

#### A.   Documentation of Stock Ownership

In connection with the present motion, the parties have presented stock certificates allegedly indicating the shareholders of some of the Corporate Defendants.  This section describes the stock ownership as represented by the certificates as well as relevant deposition commentary and a description of other documents that contradict the stock certificates.

*Agora:*  A stock certificate indicates that on some unspecified date in 2001, 1500 shares in Agora Solution Corporation – representing all of the authorized shares of that company – were issued to John R. Morrison.  (Third Aff. of Charlie Alden, Ex. E at 7, Feb. 20, 2014, Docket No. 90.)  Morrison was unable to explain how shares in a corporation were issued to him two years prior to its incorporation, testifying only that "it

---

[1] With the exception of depositions, all page number references are to the CMECF pagination.

might have been incorporated in 2003, but the corporation was established way before that." (Morrison Dep. 131:13-15.)

Minutes from a meeting held by Agora's board of directors on June 10, 2003, are inconsistent with the stock certificate produced, and specify that initially John Morrison and Mildred Morrison were each issued 250 shares and Lee Chung and David Kwok were each issued 500 shares.  (Third Alden Aff., Ex. D at 4-5.)  Minutes from a June 9, 2004 meeting of Agora's board of directors contain a resolution, providing:

> RESOLVED that the shares of stock owned by Lee Cheng[2] and David Kwok will be purchased by John R. Morrison giving John R. Morrison ownership of 1,250 shares.  Mildred B. Morrison retains her 250 shares. This 1,500 shares represent all Agora Solution outstanding authorized shares by shareholders.

(*Id.*, Ex. D at 2.)

Minutes from a January 11, 2006 Agora board meeting contain resolutions stating that "Joseph H. Whitney Chairman of the Board and Geoff Morrison Vice President, resign as officers and Board of Directors members of Agora Solution Corp." and "that Joseph H. Whitney will transfer all rights to Agora Solution stock to John R. Morrison." (*Id.*, Ex. J at 2.)  January 15, 2006 meeting minutes from a board meeting of another Corporate Defendant – MyTeleservices Corporation – contain the same resolution "that Joseph H. Whitney will transfer all rights to Agora Solution Corp.[] stock to John R. Morrison."  (*Id.*, Ex. J at 3.)

---

[2] These later minutes identify a Lee Cheng, although the June 10, 2003 minutes reference a Lee Chung.  (*Compare* Third Alden Aff., Ex. D at 2, *with id.*, Ex. D at 4-5.)

Morrison testified that Whitney never owned shares in Agora.  (Morrison Dep. 60:3-5.)  Morrison testified that he put the clause in the meeting minutes which indicated that Whitney would transfer his Agora stock to Morrison "to make sure that when I incorporated with him, and et cetera . . . that he didn't feel that he owned any of the stock of the company, because no stock had ever been issued to Joe Whitney." (*Id.* 68:3-12.)

*MyTeleservices:*  A stock certificate reflects that on April 24, 2005, 1500 shares in MyTeleservices Corporation were issued to John R. Morrison, representing all of the authorized shares in the company.  (Third Alden Aff., Ex. E at 10.)  In minutes of a MyTeleservices corporate meeting on April 12, 2005 – prior to the date of MyTeleservices' incorporation – Agora is listed as the owner of 500 MyTeleservices shares, with Morrison and Mildred Morrison each owning 500.  (Sixth Decl. of Mark J. Kallenbach, Ex. AA at 2, Mar. 13, 2014, Docket No. 101.)  In a December 23, 2005 meeting Morrison resigned as an officer of MyTeleservices "due to the fact that he cannot be an officer in more than one company billing to phone companies" and sold his shares in MyTeleservices to Mildred Morrison.  (*Id.*, Ex. AA at 5-6.)

Minutes from a December 15, 2006 meeting of MyTeleservices board of directors state that "Joseph R. Whitney will transfer all rights to MyTeleserveces [sic] stock to John R. Morrison." (Fifth Kallenbach Decl., Ex. S.)  January 15, 2006 corporate minutes from MyTeleservices contain the opposite resolution – that "John R. Morrison will transfer all rights to MyTeleserveces [sic] stock to Joseph H. Whitney." (Sixth Kallenbach Decl., Ex. AA at 10.)  This transfer of MyTeleservices stock from Morrison to Whitney is also reflected in January 11, 2006 minutes of an Agora board meeting.

- 9 -

(Third Alden Aff., Ex. J at 2.)   A 2006 tax return for MyTeleservices, prepared by Morrison's accountant, lists Whitney as the one-hundred percent owner of the company's common stock.  (Fifth Kallenbach Decl., Ex. W at 6, 10.)  When he was shown this tax return at his deposition, Morrison testified that he was "shocked to see that." (Morrison Dep. 217:12-18.)

*MyBillingServices:*  A stock certificate indicates that on February 24, 2006, 1500 shares in MyBillingServices Corporation were issued to Dawn Daniels, representing ownership of all authorized shares in the company.  (Third Alden Aff., Ex. E at 3.) Daniels is Morrison's wife's cousin.  (Morrison Dep. 43:8-12.)

*LaurenTel:*  A stock certificate reflects that 1500 shares in LaurenTel Corporation were issued to Lorraine Treadwell on May 29, 2006, representing all of the authorized shares for the corporation.  (Third Alden Aff., Ex. E at 2.)  Treadwell is Morrison's sister, (Morrison Dep. 87:24-88:1) and Morrison testified that Treadwell did not actually invest any money in LaurenTel (*id.* 88:3-10).

*Info Billing:*  A stock certificate reflects that on May 29, 2006, 1500 shares in Info Billing Corporation were issued to Morrison's daughter-in-law, Brenda Morrison, representing all of the authorized shares for the corporation.  (Third Alden Aff., Ex. E at 8; Morrison Dep. 132:7-10.)

*YourBillingSolutions:*  A stock certificate indicates that on May 29, 2006, 1500 shares in YourBillingSolutions Corporation were issued to Melvin Reed, representing all of the authorized shares for the corporation.  (Third Alden Aff., Ex. E at 12.)  Reed is Morrison's brother.  (Morrison Dep. 88:18-20.)

***LowCostBilling:*** A stock certificate indicates that 1500 shares in LowCostBilling Corporation were issued to John R. Morrison on July 3, 2006, representing all of the authorized shares for the corporation. (Third Alden Aff., Ex. E at 9.)

***GreenTreeData:*** A stock certificate indicates that on July 3, 2006, 1500 shares in GreenTreeData Corporation were issued to Morrison's sister Carol Deloatch, representing all of the authorized shares for the corporation. (Third Alden Aff., Ex. E at 4; Morrison Dep. 91:20-21.)

***MyServiceAndSupport:*** A stock certificate indicates that 1500 shares in MyServiceAndSupport Corporation were issued to Morrison's wife Mildred on June 29, 2010, representing all of the authorized shares for the corporation. (Third Alden Aff., Ex. E at 11; Morrison Dep. 15:1-2.) Morrison testified that his son, rather than his wife, might now own the corporation, although no documents regarding such a transfer are in the record. (Morrison Dep. 136:18-137:2.)

***The Guy's, MySuperLotto, and MyPrizeAwards:*** No documentation was produced by either party regarding shareholder ownership of these remaining three Corporate Defendants.

### B.   Morrison's Understanding of Whitney's Stock Ownership

Morrison testified that he could not be certain that the stock certificates produced represented accurate shareholder ownership of the Corporate Defendants explaining that "anybody could have went into the records and . . . I had lots of records that

disappeared." (Morrison Dep. 130:1-12, 132:11-22.)[3]   Morrison was also unable to testify from his own recollection as to the true stock ownership of the Corporate Defendants, explaining "[t]here were a bunch of companies there.  I don't remember who the hell the owners were." (*Id.* 43:3-4.)  Morrison could not testify, for example, as to the ownership or officers of many of the Corporate Defendants or testify as to what the corporations did.  (*See, e.g.*, *id.* 42-43, 47-49, 86, 92, 140.)

With respect to Whitney in particular, Morrison testified that "Mr. Whitney owned no stock in any company that I had been involved in" and to the best of his knowledge Whitney did not own equity in any of the Corporate Defendants.  (*Id.* 64:11-12, 142:2-13.)  But Morrison acknowledged that he did not know what other individuals involved in the Corporate Defendants may have done, explaining "I did not know if those guys had transferred some stock or done something with Joe." (*Id.* 183:18-24.)

## C.   Whitney's Understanding of Stock Certificate Holders

Defendants rely heavily upon certain comments made by Whitney during his deposition with respect to stock ownership, which they argue establish that he is not, and

---

[3] In his briefs filed in connection with the present motions, Whitney discusses at length the lack of documentation produced by Morrison and the Corporate Defendants, and appears to insinuate some sort of impropriety or bad faith on the part of Defendants related to that lack of documentation.  Whitney also contends that various documents actually produced by Defendants are forgeries.  Whitney has not, however, provided any indication to the Court of how any such insinuations should impact the Court's ruling on these motions, or how the Court could properly make credibility determinations about the authenticity of certain documents at this summary judgment stage.  In any case, because the Court ultimately dismisses Whitney's claims and Defendants' counterclaims on statute of limitations grounds, neither the lack of documentation nor the disputed authenticity of the documentation that was produced has any bearing on the Court's resolution of these cross motions.

never was, a shareholder in the Corporate Defendants.  Specifically, Whitney testified that he had no reason to believe that the individuals to whom shares of stock were issued as identified in the certificates did not actually receive the shares of stock, but also testified that he "would doubt they did."  (Whitney Dep. 94:25-95:5.)  Whitney further testified that it was his understanding "that these people" – most of whom were relatives of Morrison – "were what you would refer to as the placeholders for this stock until - - to avoid the problems of being owned by one entity."  (*Id.* 97:3-15.)

Whitney also testified that there was never any stock in any of the Corporate Defendants "that meant anything."  (*Id.* 98:6-9.)  In response to the question "[s]o you've alleged in this action that you're a shareholder in the companies, but you've just said that there was not any stock that ever meant anything," Whitney stated "Well, I don't know - - [Morrison] obviously didn't issue real stock to anybody, but that was just a - - a formality, as far as I was concerned, that - - the understanding that we operated on, that clear and unambiguous understanding, was that we were fifty-fifty partners on whatever came out of this enterprise."  (*Id.* 98:10-20.)

### D.    Whitney's Contributions to Agora

The parties discuss at length certain payments made by Whitney to Agora.  Whitney seeks to characterize these payments as equity that he invested in Agora, which he argues shows that he should have been made or might be a shareholder.  Defendants argue, on the other hand, that these payments to Agora were loans, and therefore do not demonstrate that Whitney made any equity contributions to Agora.

Whitney testified that he received a loan from Agora sometime in the fall of 2005 in the amount of approximately $140,000.  (Whitney Dep. 54:13-55:23.)  Morrison testified that the loan Whitney received from Agora was closer to $120,000.  (Morrison Dep. 56:14-15.)  Whitney produced three checks written from his bank account to Agora Solution, including one for $25,000 on May 26, 2005, one for $80,000 on December 21, 2005, and one for $30,000 on March 10, 2006.  (Fifth Kallenbach Decl., Ex. Q.)  Both Whitney and Morrison testified that the $80,000 and the $30,000 checks were repayment of the loan.  (Whitney Dep. 57:5-6, 57:22-25, 58:1-22; Morrison Dep. 105:9-23.)

It is undisputed that Whitney wrote some other checks to Agora in 2005 and 2006 – totaling at least $75,000.  (Whitney Dep. 59:18-60:24; Fifth Kallenbach Decl., Ex. J at 2; Morrison Dep. 55:11-22, 56:6-8, 110:1-12, 114:7-19.)  Whitney testified that this money was a capital contribution.  (Whitney Dep. 59:18-60:24, 86:4-12.)  Morrison testified that Whitney pressured Morrison to take this money as a loan to run Agora.  (Morrison Dep. 57:7-18.)  Neither side produced any documentation of this transaction.  Morrison testified that there was no written evidence of the loan because he viewed Whitney as a friend, and Whitney told him that a "[h]andshake will do it."  (*Id.* 95:25-96:11, 96:25-97:24.)  These loans also did not appear on Agora's balance sheet because, Morrison testified, they were "an off-the balance-sheet thing."  (*Id.* 207:7-208:2.)  Financial statements from Agora show a line titled "2004 Amount Paid by Joe Whitney" as $7,481.  (Fifth Kallenbach Decl., Ex. I at 4.)  There is also a line titled "Joe's Share Owed" which is "$158,853 Divide by 2 = $79,426.53."  (*Id.*)  Morrison testified that he had no idea what that line on the financial statement meant.  (Morrison Dep. 198:18-23.)

## IV.    DISCOVERY OF WHITNEY'S CLAIMS

On July 20, 2007, Whitney wrote an email to Morrison with the subject "AGORA." (Fifth Kallenbach Decl., Ex. E.)  In the email, Whitney stated:

> John, We need to have a serious talk.  I have absolutely NO idea what is going on at Agora.  I have never seen financials.  I have never seen a PENNY FROM THIS ENTITY.  Where are the tax returns????  Where is my K-1?  This is no way to run a business, I am feeling that you are screwing me out of my share.  You might already have with this corporate mish mash.  This is not fair to treat me like this.  For all I know there is some tax liability that that [sic] I owe!!!  It is time to come clean with your partner about your intentions.  We SHOULD be making a LOT of money.  Are you taking it out????  Where is it if not . . . ?  Whenever I ask any employee I get this stonewall, "talk to John".  I have tried to nicely get info and you just put me off.  Time and time again.  I need answers.  I want to set a time next week to have this discussion.  It's time to stop the BS and talk. . . JOSEPH.

(*Id.*)  Whitney testified that the email's reference to Agora represented to him "all of the entities" he and Morrison had together.  (Whitney Dep. 142:23-143:3, 143:17-21.)

Whitney also testified that he began asking Morrison for documents about the Corporate Defendants "[m]onths and months" previous to this email, and probably as early as March 2007.  (*Id.* 140:1-15.)  In March 2007 Whitney had regular meetings with Morrison to discuss the businesses and inquire about tax returns, which were "clearly associated with an equity ownership."  (*Id.* 144:25-147:4.)  Whitney testified that "at some point in time I would suggest that he came up with this idea that since he hadn't ever given me any stock, he could cheat me out of my stock and call it a loan" (*id.* 84:19-22), and that he started putting pressure on Morrison "to get financial statements" because "it looked like he was into cheating me" (*id.* 85:3-7).

Whitney forwarded the July 20, 2007 email to an attorney on August 23, 2007, asking if the attorney would "be a mediator to get [Morrison] to his senses to not pull this bullshit that it looked like he was pulling." (Whitney Dep. 173:19-23; *see also* Fifth Kallenbach Decl., Ex. E.) Whitney spoke with the attorney several times, but did not pursue legal action at that point. (Whitney Dep. 175:3-19.)

## V.    DEFENDANTS' COUNTERCLAIMS

Defendants' counterclaims arise out of an incident in September 2007 where Whitney rerouted funds from BSG – a billing company associated with MyTeleservices – to an account for an internet enterprise called Implied Services created by Paul Pimental and Geoff Morrison that Whitney had access to. (*Id.* 110:21-111:11, 149:21-150:18.)

### A.    Rerouting of Funds

Whitney testified that he came to an agreement with Pimental and Geoff Morrison to reroute the money from BSG "out of cash flow received from MyTeleservices." (*Id.* 151:1-5.) Whitney testified that the agreement arose when Pimental and Geoff approached him about getting a return on his investment because "it had become clear that [Morrison] was screwing" Whitney. (*Id.* 151:18-152:1.) Pimental and Geoff allegedly told Whitney that he was either the CEO, president, or chairman of the board of MyTeleservices and therefore the money flowing from BSG to MyTeleservices was "rightfully" Whitney's money." (*Id.* 152:3-8.) Pimental and Geoff explained that there was a way to divert money from MyTeleservices and asked Whitney if he would acquire

the money and then help fund an internet company similar to MyTeleservices.  (*Id.* 152:12-20.)

Whitney agreed to the arrangement, changed the wiring instructions for funds coming to MyTeleservices from BSG, and diverted between $190,000 and $212,000 to an account he controlled.   (*Id.* 112:10-18, 152:21-23, 157:6-10, 166:15-18; Fifth Kallenbach Decl., Ex. Z at 2.)  Whitney concedes that he never returned the money, but instead used it to fund the startup of Implied Services.  (Whitney Dep. 165:3-13.) Whitney testified that he took the money because "I was acting on the authority that I had and, you know, I was entitled to half of all the money and, you know, I get - - I'm going to get some of this money.  I felt I was entitled to receive compensation.  [Morrison] was screwing me."  (*Id.* 169:3-10.)

## B.      Leadership of MyTeleservices

In connection with the Defendants' counterclaims arising out of the September 2007 diversion of funds, the parties dispute whether Whitney was authorized to act on behalf of MyTeleservices at the time he changed the wiring instructions.  Several record documents speak to this issue.

A document from MyTeleservices' files from its incorporation in Delaware dated April 25, 2005, reflects that Whitney was named as an initial board member of the company.  (Fifth Kallenbach Decl., Ex. F at 9.)  Morrison also testified that Whitney was the chairman of MyTeleservices board at some point.  (Morrison Dep. 201:6-14.)   In MyTeleservices board meeting minutes from January 15, 2006, Morrison resigned from the position of president and board member and Whitney assumed the positions of

president and secretary in addition to his existing position as chairman of the board. (Sixth Kallenbach Aff., Ex. AA at 10.)  At that meeting Morrison also transferred his MyTeleservices stock to Whitney.  (*Id.*)

In minutes from a meeting of the MyTeleservices board on December 15, 2006, Whitney is referred to as "Chairman of the Board, President and CEO."  (Fifth Kallenbach Aff., Ex. R.)  The minutes also include a resolution "that Joseph H. Whitney, Board of Director member of MyTeleservices will sell MyTeleservices to Xtreme marketing under the conditions that she [sic] remains Chairman of the Board, President and CEO."  (*Id.*)  There is no documentation that this sale occurred.

A different set of minutes for a December 15, 2006 board meeting of MyTeleservices states that "Joseph H. Whitney Chairman of the Board Member, resigns as an officer of MyTeleservices Corp." and that "John R. Morrison is appointed to the position of President, CEO and Officer of MyTeleservices Corp."  (*Id.*, Ex. S.)  These meeting minutes also state that "Joseph R. Whitney will transfer all rights to MyTeleserveces [sic] stock to John R. Morrison" and that "Joseph H. Whitney will transfer all rights to Agora Solution Corp. stock to John R. Morrison."  (*Id.*)  Whitney testified that his signature on this version of the meeting minutes was a forgery. (Whitney Dep. 114:19-115:5.)

## C.    Discovery of Counterclaims

On December 21, 2007 an attorney for MyTeleservices, Inc. faxed a letter to Whitney's attorney.  In the letter, the attorney for MyTeleservices explained that the company:

MTI was recently surprised to discover that over $200,000 of its funds were illegally diverted to a bank account in Mesa, Arizona that is held in the name of Craig Hull, a former employee of MTI and one of Paul Pimental's friends.

Two days before Mr. Pimental resigned his employment with MTI, and while he was still MTI's primary contact with BSG as its account manager, a wire-transfer form was directed to BSG, instructing the company to remit payments belonging to MTI to a bank account at Washington Mutual in Mesa, Arizona. This document was purportedly signed by Mr. Whitney; however, the signature on the document appears to be a forgery based on other examples of Mr. Whitney's signature. Also, at the time the document was executed, Mr. Whitney was not an owner, officer or board member of MTI. As a result of the wire-transfer form, monies from BSG meant for MTI were not deposited into the proper account at M&I Bank, but were diverted to the unauthorized account in Arizona. By the time MTI discovered this scheme, $202,000 had already been illegally transferred.

(Fifth Kallenbach Decl., Ex. Z at 2.) The letter requested the return of the money, in addition to $10,000 in fees and costs incurred in uncovering the unauthorized transfer and engaging legal counsel. (*Id.*, Ex. Z at 3.)

## VI.    PROCEDURAL HISTORY

### A.    Second Amended Complaint

On October 20, 2010, Whitney filed a complaint against Morrison and the Corporate Defendants as well as an entity known as MyBillingGuys, LLC. (Compl., Oct. 20, 2010, Docket No. 1.) In response to an Order directing Whitney to redress deficiencies in his allegations regarding diversity of citizenship, Whitney filed an Amended Complaint (Order, Oct. 22, 2010, Docket No. 2; Am. Compl., Nov. 3, 2010, Docket No. 3) and then a Second Amended Complaint, which removed MyBillingGuys, LLC, a diversity-destroying entity, as a defendant (Am. Compl. ¶ 5; Second Am. Compl.). In the Second Amended Complaint Whitney sought a declaratory judgment

"that he is a one-half (1/2) owner of TGI and each of the Corporate Defendants' outstanding shares" (Second Am. Compl. ¶¶ 20-24) and brought claims for breach of contract, promissory estoppel, unjust enrichment, fraud, misrepresentation of intention, an accounting, breach of shareholder's rights/receiver/liquidation, breach of fiduciary duty, and conversion (*id.* ¶¶ 25-64).

### B.    Motion to Dismiss

On December 2, 2010, Defendants brought a motion to dismiss the Second Amended Complaint, arguing that Whitney's claims were barred by Delaware's three-year statute of limitations and failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Mot. to Dismiss, Dec. 2, 2010, Docket No. 6; Defs.' Mem. in Supp. of Mot. to Dismiss, Jan. 5, 2011, Docket No. 18.)[4]

The Court granted Defendants' motion to dismiss in its entirety.  *Whitney v. The Guys, Inc.* (*Whitney I*), Civ. No. 10-4296, 2011 WL 3648230 (D. Minn. Aug. 17, 2011). The Court dismissed Whitney's claims for declaratory judgment, fraud, misrepresentation of intention, and conversion, concluding that the claims alleged only duties and obligations contained in Whitney's contract claims and therefore failed to state independent tort claims.  *Id.* at *3.

---

[4] The Court denied both Whitney's motion to strike the motion to dismiss as untimely and the accompanying motion for the entry of default judgment, finding that Whitney had not been prejudiced by the three-day delay in Defendants' filing of the motion to dismiss.  (Order, Dec. 27, 2010, Docket No. 16.)

With respect to Whitney's claims for breach of contract, promissory estoppel, and unjust enrichment, the Court began by concluding that Delaware law applied to the claims under the internal-affairs doctrine which is "'a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.'"  *Id.* at *4 (quoting *Atherton v. FDIC*, 519 U.S. 213, 223-24 (1997)).  Specifically, the Court concluded that "Whitney's contract and quasi-contract claims cannot be separated from the 'internal affairs' of the corporate Defendants" which were all incorporated in Delaware, and that the relief sought by Whitney could not be granted "without directly impacting and disrupting the current ownership structure of the corporate Defendants."  *Id.* at *5.  The Court also concluded that, even in the absence of the internal-affairs doctrine, Delaware law would apply under Minnesota's five-factor choice of law analysis.  *Id.* at *5-6.  Because Delaware law governed, the Court applied Delaware's three-year statute of limitations, and concluded that it barred Whitney's claims which arose more than three years prior to October 2010.  *Id.* at *6.

Finally, the Court considered Whitney's claims for an accounting, breach of shareholder rights/receiver/liquidation, and breach of fiduciary duty – to which the parties did not dispute that Delaware law applied.  *Id.* at *7.  The Court began by concluding that it was not clear from the face of the complaint that the claims were time barred, as Whitney alleged that "Morrison has refused and **continues to deny** Whitney access to any of the Corporate Defendants' books and records, his right to participate in

governance or management and rightful shares of the profits" and the complaint provided "no dates when Whitney demanded access or when Morrison allegedly refused." *Id.* (emphasis in original) (alterations and internal quotation marks omitted). But the Court dismissed the claims finding that they were "insufficiently pleaded under *Twombly*." *Id.* at *7. The Court found the claims to be insufficient because they depended upon Whitney's status as a shareholder, whereas portions of Whitney's claims for breach of contract were based upon the theory that he was never issued shares. *Id.* Additionally, the Court concluded that:

> In the Court's view, these claims are entirely implausible based on the pleadings. He asks this Court to believe that he agreed to purchase shares of TGI and various other entities for $150,000, yet he apparently has no record of this transaction, no record (nor even any knowledge) of whether he was ever issued the shares he believes he purchased, and, despite being continually denied the benefits of ownership of the corporations he believed he bought shares of, he waited **more than five years** before seeking any relief. This simply does not pass the "smell test."

*Id.* (emphasis in original).

## C.    Eighth Circuit Appeal

Whitney appealed from the dismissal of his claims. (Notice of Appeal to Eighth Circuit, Sept. 16, 2011, Docket No. 37.) The Eighth Circuit affirmed the dismissal of Whitney's tort, quasi-contract, and contract claims, but reversed and remanded for further proceedings with respect to Whitney's claims for an accounting, breach of shareholder rights/receiver/liquidation, and breach of fiduciary duty. *Whitney v. The Guys, Inc.* (*Whitney II*), 700 F.3d 1118 (8th Cir. 2012).

The Eighth Circuit began by affirming the Court's determination that Delaware law applied to Whitney's claims. *Id.* at 1123-26. The Eighth Circuit focused on the first and third factors in Minnesota's choice of law analysis – predictability of results and simplification of the judicial task which it determined "merit substantial weight in the present case and favor the application of Delaware law." *Id.* at 1124. The court explained that in the absence of allegations to the contrary

> we believe that the parties to this purported commercial transaction must have expected the duties of the corporate defendants and the relative rights of purported owners to be defined by Delaware law. Further, it is not at all clear how a court might grant Whitney the relief he seeks without addressing matters of Delaware law. As such, the application of Delaware law represents the simpler (and, potentially, the only feasible) judicial task and appears to best honor the expectations of the parties to the alleged transaction involving the creation, ownership, and rights related to Delaware corporations.

*Id.* at 1125. Accordingly, the court applied Delaware's three-year statute of limitations and found that it barred Whitney's contract, quasi-contract, and tort claims. *Id.* at 1126-28.

With respect to Whitney's shareholder claims, the Eighth Circuit reversed the district court's dismissal, concluding that "Whitney's pleadings were minimally sufficient to present a plausible claim." *Id.* at 1128. The court first explained that dismissal on the basis that Whitney provided no documentary evidence was impermissible because "documentary evidence generally is not required at the pleading stage" and because "[i]n this circumstance, where the defendants may well possess the very documents the plaintiff needs to prove the alleged ownership, it would be odd to demand such documents from the plaintiff before discovery." *Id.* at 1128-29. The court also found

that Whitney's claims were not implausible on the basis that he had waited five years to bring his claims, explaining that "arguments regarding timeliness concerns are generally better left for assessment under statutes of limitations or the doctrine of laches." *Id.* at 1129. Specifically, the court explained:

> Defendants' timing-related argument appears to be as follows: a $175,000 investment is so large that no investor would have contributed such an astounding sum and then sat by idly for five years without raising concerns. Implicit in such an argument, however, is a value judgment or assumption concerning the relative value of that particular investment to Whitney and concerning his trust of Morrison. It is not appropriate to assess plausibility based upon such assumptions.

*Id.* The court concluded that "[i]t is at least plausible that Whitney trusted Morrison and the corporate defendants sufficiently to invest $175,000 without keeping close tabs on his investment. . . . Simply put, personal investments are not always conducted with the care and precision of regulated banks. Although this lack of care may ultimately be fatal to Whitney's ability to prove his claims, it does not make them implausible." *Id.* at 1130. Finally, the court concluded that dismissal of Whitney's claims was not appropriate on the basis that he alleged both that he was denied ownership of shares and also that he was actually an owner of shares but was being denied benefits of that ownership because plaintiffs are allowed to plead in the alternative. *Id.* Accordingly, the court reversed with respect to the three shareholder claims, and remanded for further proceedings. *Id.* (*see also* USCA J., Nov. 6, 2012, Docket No. 41.)

### D.    Answer and Counterclaims

Upon remand, Defendants filed an answer to the Second Amended Complaint denying the allegations supporting Whitney's claims for an accounting, breach of

shareholder rights/receiver/liquidation, and breach of fiduciary duty.   (Answer &
Countercls. ("Countercls."), Nov. 20, 2012, Docket No. 44.)   Defendants also assert
counterclaims for conversion, civil theft under Minn. Stat. § 604.14, unjust enrichment,
and fraud based on the allegation that Whitney wrongfully diverted $202,000 from
MyTeleservices' bank account.  (Countercls. ¶¶ 77, 81, 84, 87, 91-92.)

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material
fact and the moving party can demonstrate that it is entitled to judgment as a matter of
law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit,
and a dispute is genuine if the evidence is such that it could lead a reasonable jury to
return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986).  A court considering a motion for summary judgment must view the facts in the
light most favorable to the non-moving party and give that party the benefit of all
reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the
nonmoving party "fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the burden of
proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion
for summary judgment, a party may not rest upon allegations, but must produce probative
evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport*

*v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.      WHITNEY'S SHAREHOLDER CLAIMS

The parties agree that each of Whitney's remaining claims – that he was denied his rights as a shareholder, that Morrison breached his fiduciary duty as an officer of the Corporate Defendants, and that he is entitled to an accounting of Corporate Defendants' finances – require Whitney to show that he was a shareholder of the Corporate Defendants during the relevant time period.   Additionally, all parties agree, and the Eighth Circuit confirmed in *Whitney II* that Delaware law applies to these claims.

Defendants argue that Whitney's claims are barred by Delaware's three-year statute of limitations under Del. Code Ann. tit. 10, § 8106.   Under Delaware law "[t]he statute of limitations 'is calculated from the time of the wrongful act even if plaintiff is ignorant of the cause of action.'"   *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 562-63 (D. Del. 2010) (quoting *Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006)).   Therefore, the first step in ascertaining whether a claim brought under Delaware law is barred by the statute of limitations is to determine "the date the cause of action accrued."   *Smith v. Whelan*, Civ. No. 11-1188, 2013 WL 3169373, at *1 (D. Del. June 21, 2013) (internal quotation marks omitted).   Under Section 8106, if the cause of action accrued more than three years before the plaintiff filed his lawsuit, the statute of limitations will bar the claims unless the statute of limitations period was tolled.   *Lincoln Nat'l Life Ins. Co.*, 722 F. Supp. 2d at 562-63.   Delaware law recognizes three doctrines that can toll the statute of limitations: "(1) fraudulent concealment, (2) inherently

unknowable injury, and (3) equitable tolling." *Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*, C.A. No. 6894, 2013 WL 1200273, at *7 (Del. Ch. Mar. 26, 2013); *see In re Tyson Foods, Inc.*, 919 A.2d 563, 584-85 (Del. Ch. 2007).  "Under any of these theories, a plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice." *In re Tyson Foods, Inc.*, 919 A.2d at 585.  "Inquiry notice exists when 'persons of ordinary intelligence and prudence have facts sufficient to place them on inquiry which, **if pursued**, would lead to the discovery' of the injury." *Eluv Holdings*, 2013 WL 1200273 at *7 (alterations omitted) (emphasis in original) (quoting *Coleman v. Pricewaterhouse Coopers, LLC*, 854 A.2d 838, 842 (Del. 2004)).  Therefore "[e]ven if a plaintiff successfully invoked any of the three tolling doctrines . . . the limitations period is tolled only until the plaintiff discovers, or by exercising reasonable diligence should have discovered, its injury." *Id.*

"[A] cause of action accrues with the occurrence of the wrongful act," *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992), but in no case "before the right to institute a suit arises," *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 437 (D. Del. 1999) (internal quotation marks omitted); *see also William A. Graham Co. v. Haughey*, 646 F.3d 138, 146 (3d Cir. 2011) ("[T]he question is whether all of [a claim's] elements have come into existence such that an omniscient plaintiff could prove them in court.  At that point the cause of action is 'complete,' and has therefore accrued.").  Accrual of a cause of action based on a defendant's wrongful act "is a general concept that varies depending on the nature of the claim at issue." *Eluv Holdings*, 2013 WL 1200273 at *6.  In ascertaining when a plaintiff's claims accrued,

- 27 -

courts have carefully considered the legal theory and factual basis articulated by the plaintiffs in support of their claims.  Specifically, of relevance to Whitney's claims here, courts have examined whether a plaintiff's claim accrued upon the commission of a single wrongful act by defendant, or rather is the type of claim that alleges continuing violations which would either allow a plaintiff to rely on incidents occurring outside the statute of limitations period to establish ongoing breaches of his rights or establish that a new cause of action accrued with each continuing wrongful action.  *See Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 666 (Del. Ch. 2006) (examining whether a complaint challenged a corporation's original decision to sign certain agreements and therefore accrued at the time of the signing or rather challenged the decision of defendants to perpetuate an unfair relationship pursuant to those agreements and accrued at the time of payments made with respect to that relationship); *Kerns v. Dukes*, No. Civ. A. 1999-S, 2004 WL 766529, at *2, *5 (Del. Ch. Apr. 2, 2004) (analyzing claims based upon the allegedly unlawful creation of a sanitary sewer district and examining whether the statute of limitations ran from the creation of the district or the later date when plaintiff's received allegedly unlawful assessments based on the creation of the district); *see also Welwart v. Dataware Elecs. Corp.*, 717 N.Y.S.2d 220, 221 (N.Y. App. Div. 2000) (examining plaintiff's claim for failure to issue shares and conversion of dividends issued on those shares to determine whether "the causes of action accrued each time profits were diverted" or at the time "when the defendants allegedly deprived the plaintiff of his right to the shares and began diverting profits").

The Alaska Supreme Court considered a claim similar to Whitney's in *Egner v. Talbot's Inc.*, 214 P.3d 272 (Alaska 2009) and conducted an analysis of when plaintiff's claims regarding her shareholder status accrued that provides a useful analogy for this Court's analysis of Whitney's claim.  In *Egner*, the plaintiff, Carol, sued Talbot's, Inc. ("Talbot's"), as well as certain of her relatives that owned shares of Talbot's stock, alleging denial of her rights as a shareholder.  *Id.* at 274.  Carol's father was a director and officer of Talbot's, and Carol alleged that her father "frequently told her that she owned stock in Talbot's; that on at least six occasions before 1978 she was offered the option of a wage increase or stock [in her position at Talbot's] and that she chose the stock; and that on at least three occasions (the last of which was 1968), [her father] showed her a stock ledger that indicated that she owned shares of Talbot's stock." *Id.* at 275.  When Carol's father died, his wife Jane inherited his shares in Talbot's, and Jane told Carol that Carol did not own any Talbot's stock.  *Id.*  In 1980 Carol signed a voting trust agreement, whereby she agreed to vote Jane's shares, and acknowledged in the agreement that Jane owned all of the shares of Talbot's.  *Id.* at 276.  Carol alleged that she learned in 1986 that Jane had sold Talbot's – including all of Jane's shares – to Carol's brother-in-law.  *Id.*  Carol alleged that in 1995, however, Jane asked her to sign a document which was a stock certificate made out to Carol representing that she owned at least 100 shares of Talbot's stock.  *Id.*  In May 2006 Carol brought a lawsuit asserting, among others, claims for failure to allow inspection of corporate books and records, failure to allow exercise of various other shareholder rights under Alaska's corporations code, breach of fiduciary duty, and misappropriation of corporate funds.  *Id.* at 276-77.

- 29 -

The defendants moved for summary judgment arguing that all of Carol's claims were barred by the applicable six-year statute of limitations. *Id.* at 277.

The court began by examining when Carol's cause of action accrued under the discovery rule – the equivalent of Delaware's principle of inquiry notice –, by asking whether, before May 2000, a reasonable person in Carol's position would have had "enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights." *Id.* at 278 (internal quotation marks omitted).  The court found that Carol was on inquiry notice "no later than 1986" because at that point "[s]he knew Talbot's had been sold, that she was not considered an owner of Talbot's, that her shareholder status was denied or disputed, that she might have a cause of action, and that she should begin an inquiry to protect her rights." *Id.* at 280.  As of 1986, the court concluded, "[a] reasonable inquiry would have confirmed one of these alternative scenarios: (1) Carol was not a shareholder, (2) she was a shareholder, or (3) there was a dispute about whether she was a shareholder" and Carol could have initiated an action based on the outcome of that inquiry. *Id.* at 281.  The court explicitly noted that "[t]he presence of a genuine fact dispute about Carol's shareholder status does not create a genuine fact dispute about whether Carol knew enough to put her on inquiry notice, and thus did not excuse her from making a reasonable inquiry to protect her rights." *Id.*

Carol argued, however, that the 1995 event reconfirmed her shareholder status, and supported a continuing violations theory, which permitted her to bring claims for the violations of her shareholder rights that occurred after May 2000.  But the court rejected

this argument, concluding that the wrongful conduct alleged in Carol's complaint was essentially "denial of her alleged shareholder status."  *Id.* at 283.  The court concluded that this allegation alleged a permanent violation – upon which Carol could sue – as soon as she knew that she was no longer considered a shareholder, explaining:

> The same facts that require a conclusion that Carol was on inquiry notice no later than 1986 also require a conclusion that a permanent violation occurred no later than 1986.  The 1978 and 1986 events and the 1980 agreement were collectively sufficient to trigger a reasonable person's awareness of the alleged wrongful conduct and the need to assert her rights. The allegedly wrongful conduct was the denial of Carol's claim that she was a shareholder.  In effect, there was a denial of her alleged shareholder status.  We assume for discussion's sake that some corporate conduct related to share ownership might not amount to a permanent violation.  For example, non-permanent violations could account for a continuing failure to pay annual dividends owed a shareholder.  In comparison, non-payment resulting from the claimant's removal from the shareholder rolls would arise out of a permanent change in the claimant's status.  Because in that situation the continuing failure to pay a dividend would result from the permanent violation, the continuing violations doctrine would not allow the claimant to pursue untimely claims accruing out of the permanent violation.

*Id.* (alterations and internal quotation marks omitted).   Other courts have employed similar reasoning in the shareholder context to determine whether a plaintiff alleges continued unlawful acts, or merely continued ill effects from an original violation of his rights, in which case the cause of action accrues only once, at the time of the original violation.  *Fitzgerald v. Pharmacia Corp.*, 55 F. App'x 589, 589 (2d Cir. 2003) (finding that a cause of action for "refusal to recognize [plaintiff's] purported rights as a shareholder" accrued when the corporation sent plaintiff a letter stating that it determined it had no further obligation to her because she was not a shareholder); *Welwart*, 717 N.Y.S.2d at 221 ("The complaint should be dismissed on the basis of the Statute of Limitations . . . since the causes of action are, essentially, based upon the alleged fraud of

the defendants in depriving the plaintiff of shares of stock and diverting the profits of the corporation. Contrary to the plaintiff's contention that the causes of action accrued each time profits were diverted, the limitations period is measured from the date of the initial alleged breach in 1981 when the defendants allegedly deprived the plaintiff of his right to the shares and began diverting profits, regardless of when the damages began to accrue."); *State v. Huntington-Cleveland Irrigation Co.*, 52 P.3d 1257, 1263 (Utah 2002) ("[T]he four-year statute of limitations commenced to preclude an action on particular shares with respect to DWR's claims of reduced voting rights when HCIC specifically reclassified those shares, thus effectively denying voting rights on those particular shares, because a cause of action for reduced voting rights accrues when those rights are effectively denied.").

Analyzing Whitney's claims in light of these principles, the Court concludes that Whitney's claims fall into the category of claims that allege a single wrong based on the Corporate Defendants' refusal to recognize Whitney as a shareholder. In order to be timely, Whitney's claims must have accrued no later than October 20, 2007 – or three years before he filed the present complaint. As explained above, under Delaware law, a cause of action accrues and the statute of limitations is calculated from the time of the wrongful act even if the plaintiff is ignorant of his cause of action. But here, the Court need not decide with precision when Whitney's causes of action accrued because, based on the undisputed facts in the record, Whitney was on inquiry notice of his causes of action in August 2007. Therefore, even if some type of tolling applied to Whitney's claims that would have extended the statute of limitations more than three years after the

date of accrual, under Delaware law that tolling would have ceased when Whitney became aware of facts which would have alerted a reasonable person that he had a potential cause of action or should begin an inquiry to protect his rights – which the Court concludes occurred in August 2007.  *See In re Fruehauf Trailer Corp.*, 250 B.R. 168, 189 (D. Del. 2000) ("The statute of limitations ceases to be tolled when the plaintiff is put on inquiry notice of the alleged wrongs.").

Whitney testified that he began asking Morrison for corporate documents as early as March 2007 and had regular meetings to discuss the business and inquire about the tax returns which related to his equity ownership, because he believed that Morrison was "cheating" him out stock.  (Whitney Dep. 84:19-22, 85:3-7.)  In his July 2007 email, Whitney confirmed that he had never seen any financial statements despite repeated demands, had "never seen a PENNY FROM THIS ENTITY," and felt that Morrison was "screwing" him out of his share in the Corporate Defendants.  (Fifth Kallenbach Decl., Ex. E.)  When this email failed to elicit information from Morrison, Whitney consulted an attorney in August 2007 in the hopes of mediating his dispute with Morrison over ownership of the Corporate Defendants.  (*Id.*; Whitney Dep. 173:19-23.)  These facts would have been sufficient to put a reasonable investor on inquiry notice of the claims Whitney now brings.  In other words, at this point, a reasonable investor had sufficient facts which, if pursued, would have led him to the discovery of his cause of action.  *See Eluv Holdings*, 2013 WL 1200273 at *10 ("It is undisputed that Plaintiffs never received stock certificates.  In the six years following Eluv's attempted exercise of the Option, Plaintiffs did not receive any written material regarding Eluv's status as a shareholder.

Plaintiffs received no shareholder reports, financial statements, or notices regarding shareholder meetings.  Eluv never was asked to vote on any matters regarding Defendant's affairs and Plaintiffs never attended a stockholder's meeting after Eluv's purported exercise.  Not receiving documents of this sort should have alerted a reasonable investor to the fact that Dotomi did not consider Eluv a shareholder." (footnotes omitted)); *see also Egner*, 214 P.3d at 280 (noting that once Carol had received several indications that Talbot's may not have considered her to be a shareholder she was on inquiry notice, and should have investigated her shareholder status).

Whitney did not, however, bring the present lawsuit until October 2010 – more than three years after he had at least inquiry notice of all of the facts a reasonable investor would have needed – that he was not being treated as a shareholder and was being denied access to his rights – to bring the present claims or further investigate his rights to ascertain whether he had a cause of action.  As in *Egner*, Whitney's claim is based upon a discrete failure of Defendants to recognize him as a shareholder and provide him with the rights related to that status, allegedly wrongful conduct of which he knew of no later than August 2007 when Morrison refused to acknowledge his status as a shareholder and provide him with access to documents.  All of the facts required to either engage in a reasonable inquiry as to his rights or bring the present claims based on a refusal to recognize shareholder status were available to Whitney at that time.  *See Res. Ventures, Inc.*, 42 F. Supp. 2d at 437 (concluding that plaintiff's claims "arise from the Defendants' refusal to share in the profits of the Joint Venture with the Plaintiff and to distribute a 50% equity interest in SDK to the Plaintiff" and therefore accrued in April 1994 when

"[t]he Defendants' refusal became known to the Plaintiff . . . when the Plaintiff's Indonesian counsel informed, via letter, the Plaintiff's U.S. counsel regarding the Defendants' decision" not to share profits); *see also Egner*, 214 P.3d at 281.  The fact that the failure to be recognized as a shareholder may have had continuing effects – such as that he was continually denied access to corporate records, a role in corporate management, and what he believed to be his share of profits – does not alter the Court's conclusion that Whitney was on inquiry notice of his claims no later than August 2007. *See Marzec v. Nye*, 690 S.E.2d 537, 543 (N.C. Ct. App. 2010) ("Marzec made one request for the records on 23 April 2004.  He has not demonstrated how the ongoing failure to respond to this request constituted continual unlawful acts as opposed to continual ill effects from the original failure to produce the records.").

In opposition to Defendants' motion for summary judgment Whitney makes no arguments regarding the accrual of his claims or his entitlement to some type of tolling. Instead Whitney argues that "[t]he Court of Appeals has already determined that Whitney's shareholder related claims are not time barred."  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 47, Mar. 13, 2014, Docket No. 100.)  Whitney's interpretation of the Eighth Circuit's ruling is simply incorrect.  The Eighth Circuit concluded that dismissal of Whitney's shareholder claims for their lack of timeliness on the basis that they were therefore not plausible under *Twombly* was inappropriate. *Whitney II*, 700 F.3d at 1129.  But the Eighth Circuit specifically concluded that "arguments regarding timeliness concerns are generally better left for assessment under statutes of limitations."  *Id.*  Therefore, the Eighth Circuit specifically contemplated the

present posture – that Whitney's claims would survive a motion to dismiss as alleging plausible entitlement to relief, but could later be subject to dismissal at the summary judgment stage because his cause of action accrued more than three years prior to the commencement of this lawsuit.  The only other argument made by Whitney with respect to the statute of limitations is his contention that "[a]t a minimum, Whitney is entitled to an accounting for those entities in which he has any ownership interest commencing on October 20, 2007, which is three years prior to the time that Whitney commenced this action."  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 48.)  But this argument is misplaced because an accounting is a remedy, not an independent cause of action.  *See Stevanov v. O'Connor*, Civ. No. 3820, 2009 WL 1059640, at *15 (Del. Ch. Apr. 21, 2009) ("A claim for an accounting in the Court of Chancery generally reflects a request for a particular type of remedy, rather than an equitable claim in and of itself."); *see also Cox v. Mortg. Elec. Registration Sys., Inc.*, 794 F. Supp. 2d 1060, 1065 (D. Minn. 2011) *aff'd*, 685 F.3d 663 (8th Cir. 2012).   Therefore, even if for some reason Whitney's accounting claim was not subject to the same statute of limitations analysis explained above, he could still not receive the remedy of accounting without a viable underlying cause of action.  Because the Court concludes that the statute of limitations has run on Whitney's claims it will grant Defendants' motion for summary judgment to the extent it seeks dismissal of Whitney's claims on statute of limitations grounds.[5]

---

[5] The Court notes that even if Whitney's claims were not barred by the statute of limitations, the record here is likely woefully inadequate to support any of the relief he seeks. This is not so much a case of disputed facts (although those do exist) but rather one where there is an utter lack of proof.  In other words, the paucity of evidence is such that a reasonable jury

(Footnote continued on next page.)

## III.    COUNTERCLAIMS

The parties also bring cross motions for summary judgment with respect to Defendants' counterclaims arising out of Whitney's alleged misappropriation of approximately $200,000 from MyTeleservices.  As an initial matter, the parties dispute whether Minnesota's or Delaware's statute of limitations applies to Defendants' counterclaims.  Whitney argues that Delaware law applies and Defendants' counterclaims are time barred by the three-year statute of limitations under Del. Code Ann. tit. 10, § 8106.  Defendants argue that Minnesota's six-year statute of limitations under Minn. Stat. § 541.05, subd. 1(4), (6) applies.

---------------------------------------------

(Footnote continued.)

would likely be unable to make any sort of determination as to the relief Whitney seeks.  Here, Whitney has focused exclusively in his briefs on the argument that he is the sole shareholder of MyTeleservices and a one-half owner of The Guys, Inc. or, in the alternative that he is the sole owner of MyTeleservices and that he and Morrison equally own all of the Corporate Defendants. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 3, Feb. 21, 2014, Docket No. 93.)  But even if the Court or a jury were to be able to reach a conclusion about shareholder ownership in this case, Whitney has cited no legal authority that supports his theory of recovery or presented any evidence regarding the other aspects of his claims.  For example, Whitney asks for half of the Corporate Defendants' profits – seemingly related to his "breach of shareholder rights" claim, but does not provide any authority for how the Court could award such relief in light of the fact that a shareholder's right to profits generally can be enforced only if dividends have been issued or through a lawsuit to compel the declaration of dividends.  *See Knapp v. Bankers Sec. Corp.*, 230 F.2d 717, 721 (3d Cir. 1956).  But Whitney has made no argument or presented any evidence regarding dividends in this case.  In other words, the mere fact that Whitney might be a shareholder does not, as he appears to suggest, automatically entitle him to half of the Corporate Defendants' profits.  Similarly, Whitney moves for summary judgment in his favor on his breach of fiduciary duty claim against Morrison based on his sole argument that he is a shareholder.  But Whitney has presented no evidence of (a) Morrison was actually an officer or director of all the Corporate Defendants – and would therefore have owed him a fiduciary duty, *see In re Rural Metro Corp.*, 88 A.3d 54, 80 (Del. Ch. 2014) (noting that corporate directors owe fiduciary duties of loyalty and care to the corporation and its shareholders), or (b) what actions Morrison took that constituted a breach.

"In a diversity case, a district court sitting in Minnesota applies Minnesota's choice-of-law rules." *Allianz Ins. Co. of Canada v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006). The first step in the present choice of law analysis is to determine whether there is an actual conflict between the laws of Minnesota and Delaware. *See Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994); *see also Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). "'A conflict exists if the choice of one forum's law over the other will determine the outcome of the case.'" *Burks v. Abbott Labs.*, 639 F. Supp. 2d 1006, 1011 (D. Minn. 2009) (quoting *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 954 (Minn. 2000)); *see also Christian v. Birch*, 763 N.W.2d 50, 55 (Minn. Ct. App. 2009).

## A.    Actual Conflict

Here, Defendants argue that their counterclaims, which were brought in November 2012, are timely even under Delaware's statute of limitations – suggesting that no outcome determinative conflict exists. Specifically, Defendants argue that even if their claims based upon Whitney's September 2007 unauthorized rerouting of MyTeleservices funds are governed by Delaware law, those claims were not discovered until December 2007 and are therefore timely. Defendants' argument regarding the timeliness of their counterclaims – which they concede accrued no later than December 2007 – relies upon the filing date of Whitney's complaint – October 2010 – not the filing date of the counterclaims – November 2012. Because the existence of an outcome determinative conflict is a prerequisite to conducting a choice of law analysis, the Court addresses, as

an initial matter, whether Defendants' counterclaims would, in fact, be barred by Delaware's statute of limitations.

Under Delaware law, where a counterclaim seeks affirmative relief rather than acting merely as a defense to a plaintiff's allegations, it does not relate back to the filing of the complaint, but must independently satisfy the statute of limitations. *Di Norscia v. Tibbett*, 124 A.2d 715, 716 (Del. Sup. Ct. 1956); *see also Playtex, Inc. v. Columbia Cas.*, 1993 WL 390469, at *3 (Del. Sup. Ct. Sept. 20, 1993). In other words, if a counterclaim "is a defensive measure concerning matters growing out of the same transaction or occurrence which was the basis of the opponent's claim and (is) utilized for the reduction or extinguishment of the opponent's claim" it will not be barred by the statute of limitations if the "main action is timely." *Nalley v. McClements*, 295 F. Supp. 1357, 1359 (D. Del. 1969) (internal quotation marks omitted). But counterclaims seeking an affirmative judgment in defendant's favor "are regarded as independent causes of action" and "may not be instituted after the applicable period of the statute of limitations has expired." *Id.* at 1360 (internal quotation marks omitted).

Here, Defendants' counterclaims seek affirmative relief arising out of a particular, discrete incident in the course of Whitney's relationship with the Corporate Defendants rather than a reduction or extinguishment of Whitney's own claims. Specifically, Defendants allege conversion, civil theft, unjust enrichment and fraud, seeking damages in excess of $200,000 as well as punitive damages arising out of Whitney's alleged misappropriation of MyTeleservices funds. (Countercls. at 7-9.) These are affirmative counterclaims, not defenses to Whitney's claims for denial of his shareholder rights. *See*

*PNC Bank, Del. v. Turner*, 659 A.2d 222, 223, 225 (Del. Super. Ct. 1995) (finding a counterclaim alleging a violation of the Equal Credit Opportunity Act with respect to certain notes and seeking a monetary award to be an affirmative counterclaim barred by the statute of limitations in an action where plaintiff alleged default on the payment of those notes because the counterclaim "is an independent action which is not dependent upon the plaintiff's claim.  In other words, [defendant] was not required to rely on the commencement of an action by plaintiff in order to initiate an action of her own."). Therefore, the Court concludes that Defendants' counterclaims, as affirmative causes of action, are required to satisfy the statute of limitations independently.   Because the counterclaims accrued no later than December 2007, as evidenced by the letter from MyTeleservices explaining the discovery of the diverted funds, Defendants would have had to bring their counterclaims by December 2010 to be timely under Delaware's statute of limitations.  But the counterclaims were not filed until November 2012.  Accordingly, Defendants' counterclaims are barred under Delaware law, but would still be timely under Minnesota's six-year statute of limitations.   Therefore, an actual, outcome determinative conflict exists between Delaware and Minnesota law with regard to the statute of limitations, and the Court will proceed to conduct a choice of law analysis.

**B.      Constitutional Application**

After determining that an actual conflict exists, Minnesota courts next "consider whether the rule of each state may be constitutionally applied." *Nodak Mut. Ins. Co.*, 590 N.W.2d at 672.  "'[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation

of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'"  *Jepson*, 513 N.W.2d at 469 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).  In making this determination, the Court considers the nature and number of contacts the state has to the facts of the case.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985).

The parties do not dispute that either state's law could constitutionally be applied to Defendants' counterclaims.  Indeed, the Eighth Circuit has already found that either Delaware or Minnesota law could constitutionally be applied to Whitney's claims, and the Court concludes that although the allegations in the counterclaims are different from the allegations underpinning Whitney's claims, the Eighth Circuit's analysis of the constitutionality of applying either state's law applies with equal force here.  The Eighth Circuit concluded that in light of "the relevancy of Delaware law to determining the ownership issues inherent in the contract claims, there is nothing 'arbitrary nor fundamentally unfair' about applying Delaware law."  *Whitney II*, 700 F.3d at 1123-24 (quoting *Allstate Ins. Co.*, 449 U.S. at 313).  The Eighth Circuit also found application of Delaware law to be constitutional because issues regarding ownership and the duties owed to Whitney would "turn almost entirely on an analysis of Delaware corporate law." *Id.* at 1124.  As with Whitney's claims, resolution of Defendants' counterclaims would turn almost entirely on an analysis of Delaware corporate law to ascertain Whitney's role in and control over MyTeleservices, and correspondingly, its funds.  Therefore, the Court concludes that application of Delaware law to Defendants' counterclaims would be constitutional.

C.     Choice Influencing Considerations

Where, as here, an actual conflict exists and the law of either state can constitutionally be applied, the Court must go on to apply five choice-influencing considerations to determine which law should govern: (1) predictability of result; (2) maintenance of interstate order; (3) simplification of judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Jepson*, 513 N.W.2d at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973)).

Defendants' primary argument that Minnesota law should apply under the choice-influencing considerations is their contention that the agreement between Pimental, Geoff Morrison, and Whitney regarding the diverting of funds from MyTeleservices was conceived in Minnesota and the companies "reside" in Minnesota.  But in light of the procedural history of this matter, the Court finds these arguments unpersuasive. Defendants advocated strongly at the motion to dismiss stage and on appeal that Delaware law applied in order to achieve the dismissal of Whitney's claims on statute of limitations grounds.   The Eighth Circuit agreed with Defendants and engaged in a thorough choice of law analysis to affirm the Court's determination that Delaware law applied to all of Whitney's claims – including ones such as fraud that, like Defendants' counterclaims, was conceived of and occurred in Minnesota.  In particular, the Eighth Circuit gave "substantial weight" to the factors examining predictability of results and simplification of the judicial task, to conclude that Delaware law should apply to Whitney's claims, explaining:

> [W]e believe that the parties to this purported commercial transaction must have expected the duties of the corporate defendants and the relative rights of purported owners to be defined by Delaware law.  Further, it is not at all clear how a court might grant Whitney the relief he seeks without addressing matters of Delaware law.  As such, the application of Delaware law represents the simpler (and, potentially, the only feasible) judicial task and appears to best honor the expectations of the parties to the alleged transaction involving the creation, ownership, and rights related to Delaware corporations.

*Id.* at 1125.  The same analysis is true for Defendants' counterclaims.  As described in the background section of this Order, the primary issue discussed by both sides regarding the counterclaims is whether Whitney was an officer or director of MyTeleservices and therefore whether he had the authority to reroute the funds to MyTeleservices.  Therefore, in order to decide Defendants' claims for conversion, unjust enrichment, fraud, and civil theft, the Court would necessarily be required to address matters of Delaware corporate law.  Additionally, although each of these shell corporations may have been housed at some point in Minnesota, this was also the case with respect to Whitney's claims, and does not alter the fact that Defendants are Delaware corporations that could have predicted that the rights and duties of their owners or alleged owners would be defined by Delaware law.  Accordingly, the Court concludes that Delaware law applies to Defendants' counterclaims, and those counterclaims are barred by the statute of limitations.  Therefore, the Court will grant Whitney's motion for summary judgment to the extent it seeks dismissal of Defendants' counterclaims on statute of limitations grounds.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 87] is **GRANTED in part** and **DENIED in part**.

a.    The motion is **GRANTED** to the extent it seeks dismissal of Plaintiff's claims on statute of limitations grounds.

b.    The motion is **DENIED** in all other respects.

c.    Plaintiff's claims for an accounting (Count VII), breach of shareholder rights (Count VIII), and breach of fiduciary duty (Count IX) are **DISMISSED with prejudice**.

2.    Plaintiff's Motion for Partial Summary Judgment [Docket No. 91] is **GRANTED in part** and **DENIED in part**.

a.    The motion is **GRANTED** to the extent it seeks dismissal of Defendants' counterclaims on statute of limitations grounds.

b.    The motion is **DENIED** in all other respects.

c.    Defendants' counterclaims for conversion (Count I), civil theft (Count II), unjust enrichment (Count III), and fraud (Count IV) are **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  September 23, 2014          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                         United States District Judge